[Civ. No. 29739. Second Dist., Div. Two. May 31, 1967.]

INTERNATIONAL ATLAS SERVICES, INC., Plaintiff and Appellant, v. TWENTIETH CENTURY AIRCRAFT COMPANY et al., Defendants and Respondents.

George O. West and Merritt G. Smalley for Plaintiff and Appellant.

Goldstein, Bernson & Wolf and Harold B. Bernson for Defendants and Respondents.

FLEMING, J.—Atlas, a corporation in the business of repairing and maintaining aircraft engines, sued for claim and delivery of three aircraft engines and one QEC (quick engine change) unit attached to a DC-6B aircraft, No. 90771.

From a judgment in favor of Twentieth Century, which had repossessed the aircraft as legal owner and conditional seller, Atlas appeals.

The controversy developed out of the sale of a four-engine DC-6B in 1961 by Twentieth Century to President Airlines under conditional sales contract. President Airlines, an operator of aircraft and not a party to this suit, employed Atlas to service and maintain the aircraft, the maintenance service to include scheduled engine changes and engine overhauls. Both Atlas and Twentieth Century now claim ownership of engines installed in the aircraft by Atlas in the course of scheduled maintenance, engines which came into the possession of Twentieth Century when it repossessed the aircraft on President Airlines' default.

Under the 1961 conditional sale of the aircraft to President Airlines, monthly installments on the purchase price ran from $12,500 to $20,000, and legal title and ownership of the aircraft remained in Twentieth Century until full payment of the purchase price, $525,000 plus interest. Before delivery Twentieth Century affixed two plaques to the aircraft announcing its legal ownership of the airplane and the conditional nature of the interest of President Airlines. On June 6, 1961, President Airlines registered its ownership with the Federal Aviation Agency, and on the same day Twentieth Century recorded its conditional sales contract with the Aircraft Records Branch of the Federal Aviation Agency at Oklahoma City, Oklahoma. The contract of sale required President Airlines to keep the aircraft in good order and repair and to pay all expenses of maintenance and overhaul. With respect to replacement of equipment the contract provided: ''Buyer [President] shall, at its own cost and expense, replace in or on said aircraft, any and all parts, equipment . . . or accessories which may be worn out . . . or otherwise rendered unfit for use . . . with other property which shall . . . be owned by Buyer free and clear of all liens and encumbrances. Buyer shall, at its own expense, perform all engine . . . overhaul and inspection and maintenance service on said aircraft . . . Buyer shall have the right to remove from said aircraft any engine . . . or other article of equipment . . which may have become unfit for use, but only if Buyer shall have substituted for the same another engine, . . . or other article of equipment which is owned by Buyer and is not at the time subject to any lien or other . . . claim, charge or encumbrance. . . .''

On taking possession of the aircraft President Airlines contracted for maintenance with Atlas, which agreed among other services to make all engine changes and engine overhauls needed to keep N-90771 airworthy. The customary method of servicing engines in large aircraft is by engine substitution, sometimes including a QEC to support the engine. An engine which needs overhauling or whose time has run out is replaced by a newly overhauled engine with zero time, and the old engine in turn is completely overhauled and rebuilt. It then becomes an engine with zero time and thereafter may be installed in the same or other aircraft as the need for engine replacement arises. Aircraft engines bear serial numbers for identification, and their ownership may be recorded with the Aircraft Records Branch of the Federal Aviation Agency in Oklahoma City.

When President Airlines defaulted in its payments, Twentieth Century repossessed the aircraft, as it was entitled to do under its conditional sales contract. At the time of repossession the aircraft was equipped with three engines and a QEC which Atlas had installed in the ordinary course of scheduled maintenance and to which Atlas retained legal title. Atlas claimed ownership and the right to possession of these three engines, relying on the terms of its maintenance agreement with President Airlines, "Title to all spare QEC's and engines shall at all times remain in IAS [Atlas] . . ." Issue was thus joined of priority of right between the legal owner of a component part and the legal owner of the principal property in which the component part had been installed.

Under California law in effect in 1961 this controversy would normally have been governed by the provisions of Civil Code section 1025 dealing with accessions to personal property: "When things belonging to different owners have been united so as to form a single thing, and cannot be separated without injury, the whole belongs to the owner of the thing which forms the principal part; who must, however, reimburse the value of the residue to the other owner, or surrender the whole to him." Under this rule if the component part cannot be detached without severely diminishing the market value of the principal part, then the component part belongs to the owner of the principal part, who must, however, reimburse the owner of the component part for its value. Since aircraft cannot function without engines, the facts of the present case place it squarely within the provisions of this

rule. (*Sasia & Wallace, Inc.* v. *Scarborough Implement Co.*, 154 Cal.App.2d 308 [316 P.2d 39]; cf. *A. Meister & Sons* v. *Harrison*, 56 Cal.App. 679 [206 P. 106].) Following this rule we would be required to determine the value of the engines at the time of repossession and then decide whether that value should be compared with the value of the engines on the aircraft at the time of its sale to President Airlines or with the value of the run-out engines removed from the aircraft at the time of their replacement.

Were we to consider the rights of the parties under current California law, we would find the position of the owner of a component part in relation to the owner of the principal property even stronger than it had been under prior law, and we would be required to give full recognition to the continued separate ownership of the component part installed in the aircraft. Commercial Code, section 9314, reads: "(1) A security interest in goods which attaches before they are installed in or affixed to other goods takes priority as to the goods installed or affixed (called in this section 'accessions') over the claims of all persons to the whole except as stated in subdivision (3) . . ." [Subdivision (3) has no application, since it relates to subsequent purchases and subsequent advances.] The official comment under section 9314 of the Uniform Commercial Code has this to say: "This Section changes prior law in that the secured party claiming an interest in a part (e.g., a new motor in an old car) is entitled to priority and has a right to remove even though under other rules of law the part now belongs to the whole."

It would appear, then, that under California law Atlas at a minimum should recover the value of its engines and at a maximum should recover the engines themselves. Nevertheless, we have concluded that California law does not apply to this case, that the controversy is governed by the laws of the United States, and that under federal law Twentieth Century must prevail. ▉ As we see it, general California law on the subject of title and liens to personal property in relation to component parts has been superseded by specific federal law with respect to aircraft. Section 503 of the Federal Aviation Act of 1958, derived from the Civil Aeronautics Act of 1938, provides for centralized registration and recordation of interests in aircraft with the Federal Aviation Agency. The pertinent provisions of the statute are found in 49 United States Code, section 1403:

"(a) The Administrator shall establish and maintain a system for the recording of each and all of the following:

"(1) Any conveyance which affects the title to, or any interest in, any civil aircraft of the United States;

"(2) Any *lease,* and any mortgage, equipment trust, contract of conditional sale, or other instrument executed for security purposes, which lease or other instrument affects the title to, or any interest in, *any specifically identified aircraft engine* [over 750 horsepower] . . . or any specifically identified aircraft propeller [capacity over 750 horsepower] . . .

"(3) Any lease, and any mortgage, equipment trust, contract of conditional sale, or other instrument executed for security purposes, which lease or other instrument affects the title to, or any interest in, any aircraft engines, propellers, or appliances . . . which instrument need only describe generally by types the engines, propellers, appliances, and spare parts covered thereby and designate the location or locations thereof; . . .

"(c) *No* conveyance or *instrument the recording of which is provided for by subsection (a)* of this section *shall be valid in respect of such aircraft,* aircraft engine or *engines,* propellers, appliances, or spare parts against any person other than the person by whom the conveyance or other instrument is made or given, his heir or devisee, or any person having actual notice thereof, *until such conveyance or other instrument is filed for recordation* in the office of the Administrator: . . .

"(d) Each conveyance or other instrument recorded by means of or under the system provided for in subsection (a) or (b) of this section shall from the time of its filing for recordation be valid as to all persons without further or other recordation, except that an instrument recorded pursuant to subsection (a)(3) of this section shall be effective only with respect to those of such items which may from time to time be situated at the designated location or locations and only while so situated: *Provided,* That an instrument recorded under subsection (a) (2) of this section shall not be affected as to the engine or engines, or propeller or propellers, specifically identified therein, by an instrument theretofore or thereafter recorded pursuant to subsection (a) (3) of this section." (Italics added.)

It seems clear that Congress has recognized the extreme

mobility of large aircraft for which neither state nor national boundaries can delineate or assure any fixed controls. Without some central system of recording ownership and other property interests in aircraft, security transactions involving aircraft engaged in continuous movement would amount to little more than attempts to control ownership of fish and game, which become objects of ownership only when taken. (Civ. Code, § 656.) To bring order into the field of aircraft ownership and finance, the federal government in a manner within its sphere set up a comprehensive scheme of centralized recordation, which, if properly used, provides adequate protection for all substantial property interests in large aircraft, both for the aircraft itself and for its principal component parts. Under section 1403(a)(1) a security interest in the aircraft as a whole can be recorded. Under section 1403(a)(2) an interest in its specific engines and propellers can be recorded. A conveyance, lease, or security instrument recorded under section 1403(a) is fully valid against all persons from the time of its filing without further or other recordation. Under section 1403(c) a conveyance or instrument which could have been recorded but was not, is, until so recorded, invalid against a person without actual notice of the conveyance or instrument. The section also provides for bulk registration of engines, propellers, and spare parts (§ 1403(a)(3)), but it is careful to subordinate this bulk registration to the specific registration of particular property under subsection (a)(2) (i.e., engines and propellers).

 Here we have a complete and comprehensive system of recordation which necessarily supersedes inconsistent state law. Constitutionally, the federal government may be said to have fully occupied the field of recordation of interests in aircraft and of rights derived from recordation, and to have established paramount law in this area. Atlas could have fully protected its rights in these engines and preserved a good title throughout the world by taking advantage of this national system of recordation and recording its interest in specifically numbered aircraft engines with the Federal Aviation Agency. Its failure to record in Oklahoma City its ownership of the engines prior to repossession of the aircraft by Twentieth Century resulted in the subordination of its interest in the engines to the recorded interest of Twentieth Century in the aircraft as a whole. The latter, by recording with the Federal Aviation Authority, established a superior

right to the aircraft, its engines, and its propellers, effective against all other interests in the aircraft except known or recorded adverse interests. This paramount interest under federal law effectively superseded any inconsistent interest derived from state law.

On federal preemption as overriding state law in this field, we find persuasive *United States* v. *United Aircraft Corp.*, 80 F.Supp. 52. In that case the United States, as a mortgagee, had recorded under federal law a purchase money chattel mortgage on a particular aircraft. Later United Aircraft, to whom the engines from the aircraft had been delivered by the mortgagor for overhaul, asserted an artificer's lien against the engines under Connecticut law. The court declared that Congress had preempted the field of liens on aircraft and that federal law was controlling. In the particular case, however, the artificer's lien was upheld because of the insufficiency of the notice to third parties of the mortgagee's lien—only the number of the aircraft itself having been recorded and not the serial numbers of its individual engines. Since the time of this decision the gap which then existed in the law has been closed, and federal law now authorizes the recording of specifically numbered engines. *Crescent City Aviation, Inc.* v. *Beverly Bank* (1966) —— Ind.App. —— [219 N.E.2d 446].)

■ To avoid the impact of the recordation statute, Atlas argues that the provisions of the law are limited to the recordation of security interests; that its installation of engines in N-90771 was only a loan of personal property which did not fall within the classification of a transaction executed for security purposes. We think this argument is sufficiently answered by the text of the statute itself, section 1403 (a)(2), which specifically applies to "Any lease" [and any mortgage or other security instrument] "which lease or other instrument affects the title to, or any interest in, any specifically identified aircraft engine . . ." The term lease is broad enough to include a bailment of personal property, and the statute clearly applies. (*Carstensen* v. *Gottesburen*, 215 Cal. 258 [9 P.2d 831].)

Finally, Atlas argues that since there was no testimony to prove that section 1403(a)(2) had ever been used to record interests in aircraft engines we must assume it was a custom of the industry not to use the statute for that purpose. The assumption does not follow from the premises and is contradicted by the congressional committee report on the subject,

1959 U.S. Code Congressional News, pp. 1762, 1764. Nor does it follow from the proof in this very case, for the record reflects that Bank of America, a prior lienholder recognized as such by all parties, had recorded with the Federal Aviation Agency a security interest in the plane and in specified aircraft engines identified by number, a paramount interest which no one saw fit to challenge.

We conclude that the failure of Atlas to record its interest in the airplane engines installed in an aircraft to which Twentieth Century held legal title, which title the latter had properly recorded under federal law, subordinated its interest in the engines at the time of repossession to the interest of Twentieth Century in the aircraft as a whole.

Judgment affirmed.

Roth, P. J., and Herndon, J., concurred.

A petition for a rehearing was denied June 27, 1967, and appellant's petition for a hearing by the Supreme Court was denied July 26, 1967.